May it please the Court, Mike Shee for the Government. I'd like to reserve five minutes of my time for rebuttal. All right. I'll try to help you out, but please keep your eye on the clock yourself as well. I will. Thank you. So during the stay argument a few weeks ago, the discussion focused principally on why the injunction exceeded the District Court's equitable and Article III authority. Those arguments apply with full force in this context, too, and demonstrate that the entire injunction should be vacated. But I also want to emphasize today the District Court's flawed merits analysis, beginning with its discussion of retaliation, which underlies both the District Court's standing analysis and the District Court's discussion of the First Amendment retaliation merits. Under the Supreme Court's decision in Lyons, it's black-letter law that plaintiffs don't have standing to get prospective injunctive relief simply by showing that they were subjected to some harm in the past. Plaintiffs need to demonstrate something more in order to get that kind of injunction. And here, where the past harm turns on allegations of retaliatory force, plaintiffs need to show not only that they would be subject to retaliatory force again in the future, but because this is a lawsuit not against individual officers but DHS, that such retaliation would be attributable not only to individual officers but to the agency as a whole. The problem for plaintiffs is that as the District Court recognized and as we set forth on pages 17 and 18 of the opening brief in particular, DHS not only does not have a policy of engaging in retaliatory force, it has expressed policies forbidding officers from engaging in the kind of force that form the basis of plaintiffs' allegations of harm. On your theory, counsel, what would it take for the plaintiffs to establish standing under these circumstances? You're saying it has to apply. The District Court basically made factual findings of consistent violations. Under that circumstance, give me some examples of the types of allegations that the plaintiffs would have to allege in order to establish standing for the retaliation claims. That's a difficult question to answer, Your Honor, because at the theoretical level, it's hard to say. Assuming that on this record that the District Court's findings of consistent ongoing violations are not clearly erroneous. So on that record, what more does it take? So assuming, and as Your Honor is aware, we disagree that the District Court's findings are not clearly erroneous, but like spotting the District Court every single one of its factual findings, then the District Court would need to demonstrate that those actions of individual officers could give rise to an inference that DHS as an agency had a policy of retaliation. And that's an inferential leap that's very difficult for plaintiffs for several reasons. The first is, as the District Court itself recognized, there were widespread protests in the Los Angeles area from June to July. And so it's not clear from this record whether the protests discussed in plaintiff's declarations on which the District Court relied are representative of all interactions between DHS officers and protesters and journalists during that time. And so we don't know. Can the inferential leap be made by a pattern of conduct that violates DHS's own policies? At a very high level of generality, Your Honor, this Court has looked to allegations of a pattern. So at that very high level of generality, the answer is yes. But the District Court's findings here are insufficient not only because we don't know the denominator, so we just don't know how representative these allegations are of all of DHS officers' interactions with protesters in the region, but also, and this is critical, even with respect to the protests that are described in the declarations, there's no dispute that at least at two of them, no crowd control devices were used at all. So there could not have been any retaliatory force used there. So, Counsel, if we were, for the sake of argument, assume that we were to find index newspapers as binding on our panel. In index newspapers, the Court said a plaintiff threatened with future injury has standing to sue if the threatened injury is certainly impending or there is a substantial risk the harm will occur. So if that, if we were to decide that were the test and that we were bound by this, notwithstanding Lyons, which came before index newspapers, and notwithstanding the Supreme Court's stay in 2025, why wouldn't the plaintiffs have shown a substantial risk the harm will occur? So, Your Honor, I will answer the merits of that, but I do want to flag again, we disagree that index newspapers is precedential, but assuming that index newspapers is precedential, that determination was based on the factual record in that case, and so that fact-specific application of, you know, that version of the Lyons test to the index newspapers facts wouldn't control this panel's resolution of the index newspapers test to the unique facts here. Can we take anything, and I'll be asking your friend this too, can we take anything at all from the Supreme Court's order in Nome v. Vasquez-Perdomo, or is that just there's nothing there, that there's a one-judge concurrence, but basically there's nothing there that we can take as precedential for the purposes of this case, or do you think there is something there? My understanding is that the order is controlling with respect to the issues that were addressed by the order, but we do think that Your Honor should pay close attention to the concurring opinions discussion of Lyons, which we think is consistent with how the Supreme Court has applied Lyons, and Justice Kavanaugh's concurrence makes very clear, again, these principles that merely alleging instances of past harm can't be sufficient. Something more needs to be present. And there's something more here, Your Honor, is this inference that because allegedly a lot of retaliation happened, that retaliation is representative and thus overrides the clear and undisputed evidence in this record that DHS has no policy of retaliation, and that's just not an inferential leap that is supported by the evidence, because as I was discussing with you, Judgment, the record here demonstrates that even at some protests discussed where there was a substantial amount of violence, like, for example, at the July 4th MDC protest where officers were attacked, no crowd control devices were used, and that's a very odd thing to have occurred if DHS does have what plaintiffs allege is this policy of official retaliation. But I also want to go to the district court's factual findings. Counsel, if I could interrupt you for a second to ask you a question on my mind. That is, how should we reconcile our circuit's precedent in the Easy Rider's case with the CASA decision which limits relief to the parties? In Easy Riders, we gave relief to non-parties on the theory that there's no way the court could distinguish who's a party and who's not. So, Your Honor, I confess I'm not familiar with that case from this court that you've cited, but what I can say is CASA sets forth general principles applicable to all grants of injunctive relief, making clear that complete relief is a ceiling and not a floor, and to the extent that there are questions of how to apply injunctive relief that would be appropriate under the circumstances to plaintiffs, given the difficulty of identifying plaintiffs, that is not grounds for expanding an injunction beyond what Article III and general principles of equity would support. That is instead an instruction that the court enter the injunction that is appropriate, and then the government will, in the first instance, determine how to comply with that injunction. And that's a critical point, Your Honor, because in this case, the district court transgressed CASA's limitations on equitable relief in two ways. The first is that like plaintiffs on appeal, the district court assumed that if plaintiffs are likely to succeed on the merits, then courts must grant them complete relief. And that's in stark disagreement with what the Supreme Court articulated in CASA about how complete relief is not an equitable entitlement. And the second piece of it is that even the terms of the injunction itself, so setting aside the reach of the injunction, which this court has already limited to the named plaintiffs in the stay posture, but the terms of this injunction go far beyond what is necessary even to provide complete relief to plaintiffs. And the audible warnings component of the injunction, I think, is most illustrative. The injunction requires at least two audible warnings before the use of crowd control devices. But as this court held in the Puente against City of Phoenix case, the First Amendment contains no such requirement. And so it's very odd for the district court to impose as a remedy prospectively for First Amendment violations a requirement on DHS that the First Amendment does not contain, as this court previously held. And so that is just one example of the many ways in which this injunction goes beyond the district court's Article III inequitable powers. And the warnings, the district court defined some of the content of the warnings, too. That's exactly right, Your Honor. The district court said, here are the magic words that officers must and can't. Every time. Every time. And furthermore, the district court said that those warnings need to be audible to the people to whom it applies, which is everybody, like protesters included. And so that makes the audibility determination subject to the whim of the people in the crowd. And it's not entirely within the control of the officers, whether in a very chaotic environment of a disruptive or violent protest, they can guarantee that everybody in the crowd who might be affected by crowd control devices, many of which have a broad area of effect by design, that's how they work, will have heard that warning or will say that they've heard that warning in court. So, counsel, this question may be kind of neither here nor there for this appeal. But since you all were last before us in the Zoom hearing, anything going on protest-wise? So, the information that I have, Your Honor, comes from, the most recent information I have, comes from still the papers at the State Posture. So, to the extent those papers make clear that there are still protests ongoing, but the character of those protests has changed. And so we no longer are seeing, according to those declarations, the same sort of organized massive protests at the static federal facilities. The protests there tend to be ongoing, but smaller and more infrequent. And similarly, in the public areas of operation, according to, for example, the supplemental Molina Declaration, which is document 58-4 in the record, there are still ad hoc protests targeting immigration enforcement missions in the field. And so that's the most recent information I have, Your Honor. Counsel, I have a further question based on your comments about what Judge Bennett asked you. And that's this. If the injunction in terms of scope is overbroad in any way, then assuming that the protester and observer's position prevails in this court, that they were entitled to an injunction, isn't our panel able to, like, affirm in part, but to the extent any particular provision is overbroad? So, Your Honor, the panel is certainly entitled to, you know, modify the injunction on appeal and say that only some of it survives and some of it doesn't survive. So that's certainly within the judicial power of a reviewing court of appeals on appeal from a district court's injunction. But I see my time has expired. May I complete my answer? Go ahead, please. The critical point here is that this injunction is so overbroad and so unworkable in so many different ways that we submit that process is better left to the district court in the first instance and this injunction should ought to be vacated. Because it's not a simple matter just of saying that the injunction is overbroad because it applies to too many people, as this court held at the state posture. As I described, and as the reply brief in particular makes clear, the Supreme Court has traditionally not looked favorably on efforts to impose programmatic injunctions on law enforcement operators on the basis of individualized assertions of misconduct. And that principle sounds, as the Supreme Court has described it in Article III. And so that's one significant problem with the district court's injunction. Another problem, as I described, is that the specific prescriptions and proscriptions of the injunctions just bear no reasonable relation to any of the First Amendment claims that the other side has brought. There's nothing in the First Amendment law of retaliation, for example, or the First Amendment law of right of access that compels not one, but at least two warnings before crowd control devices can be deployed. And so that's another way in which this injunction is overbroad. And finally, because of the many workability concerns that the government has raised, we think that just, you know, to the extent that the court says that plaintiffs are likely to prevail on the merits of one or both of their First Amendment claims, the right approach would be to give guidance to the district court that it needs to pay closer attention to the Article III and equitable guardrails on the use of injunctive authority, and then for the district court to fashion some new injunction that is within the scope of its authority. And then that injunction could be subject to further review by either side if warranted. Thank you, counsel. I know you wanted to save some time. Thank you, Your Honor. I know the questioning took you over time, so I'll give you your five minutes back. Thank you, Your Honors, and may it please the court. We would still like to split time in the same way we did at the stay argument with Ms. Wong, addressing the standing and justiciability and CASA issues. So we have roughly ten minutes, but if you need to talk to me more or need to talk to her more, please do that. All right. That's fine. To make it easier, let's put ten minutes on the clock then. Okay. Thank you, Your Honors. The First Amendment protects the right to voice your disagreement with the government, and it protects the right of the press to report on these events. The district court found that defendants had been suppressing these rights with shocking savagery. There could not be a clearer case of retaliation than this one. They shot our plaintiff, Abigail Almeida, when she was holding up a sign that said raids don't teach justice, they teach fear. They shot Charles Hsu when he was trying to film an arrest. They shot many people, our clients and many others, in the face, in the head, in the neck, in the back, over and over and over again. And the district court issued relief that was narrowly tailored to address these kind of harms. And what the harm is, is our clients have a right to attend these events, no matter in what capacity, whether they're a legal observer or a reporter or a protester, without fear that they're going to suffer serious injuries. Counsel, let me ask you this, because I think the district court's factual findings are compelling, but as I'm sure you've gleaned from the argument on the stay motion, I think the panel may have serious concerns about the tailoring. Can you address the question that Judge Gould asked of your opposing counsel on what to do if we are concerned with overbreadth? Is it your view that the best course of action is to vacate the preliminary instruction and remand with some appropriate guidance and instructions to the district court? Or we're usually not in the business of excising certain words and provisions. That's a tougher task. What is your view on that? Well, I think there's two parts to my answer. The first part is I think that the court, if it has concerns about overbreadth, it can do what it did in the stay order and address those itself, and I think it's much more efficient than going back down to district court, having the judge make a different injunction, coming back up here. So I think if there's specific concerns that this court has, that would be appropriate. I also note that this court also has the ability to affirm the injunction and order the district court to modify it to address its concerns, and so that would be a separate solution. I don't think vacating the injunction and the important protections that it provides would be an appropriate remedy. I think that's probably the least wise course here for this court. Counsel, it's not clear to me exactly what issues you're dividing with your friend, so should I address a question or two about Nome v. Vasquez, Perdomo, and Lyons to you or to your colleague? I think it's better to defer it to my colleague. Okay, thank you. I think the part where, you know, we were discussing last time about the safety and efficacy of this injunction. I think the record now, with the amicus briefs that have come in, has more detail and more information from the court. I think it's particularly compelling that other law enforcement agencies have come out in favor of this injunction, and in specific, all the parts about use of force, the parts about warnings. These are ways that you can prevent people from being terrorized at these events, which is ultimately the harm that we're looking at. So many states have come out in favor of it. The district court, in its order in footnote 32, actually indicated that other courts have issued similar injunctions without any harm or difficulty. And then we have the track record in index newspapers. So I would say, just in terms of the safety and efficacy of this injunction, it's well established. And certainly the parts where they have to execute on their own policies, those parts are parts where the police have trained over and over and over again for just these purposes. We were a little bit concerned in index newspapers when we imposed sort of a new requirement that the Portland Police and DHS had not been following until that time. Well, since index newspapers, we've received additional guidance from the Supreme Court, and we've got to deal with that. For example, Trump v. Casa's discussion of what it means to provide complete relief, and what I'd like to hear more is your view on how we reconcile the directions from the Supreme Court in Trump v. Casa with the scope of relief that the district court granted in this case. Well, it's very difficult, and Ms. Wong may have more to say about this, but from a perspective of a protester, if you shoot the person next to me, that's going to cause the same kind of chilling. Like, if our plaintiffs are safe, it's still, you know, or if they're not shot, it doesn't mean that they're safe if you have these sort of indiscriminate acts of violence that the court found that they were engaging in over and over and over again. And so that's kind of the, you know, one part of it. I think the other part of it is easy riders and the fact that you can't distinguish among the plaintiffs. But going to follow up on Judge Nguyen's question and also Judge Gould's question to your friend, didn't the Supreme Court in Casa essentially tell us that what you've advocated for isn't on the table anymore? The government's applications to partially stay are granted to the extent that the applications are broader than necessary to provide complete relief to each plaintiff withstanding to sue. If we accepted what you just said in response to Judge Nguyen's question, that seems to me to be directly contrary to what the Supreme Court told us in Casa. Well, if our plaintiff has standing to sue and their injury is that, you know, I'm afraid to go to these protests because they're indiscriminately shooting into crowds, you need an injunction to stop them from indiscriminately shooting into crowds to provide complete relief to that plaintiff. And that's our point, is it's very difficult. I think one of the issues is sometimes complete relief isn't possible. I mean, it's very difficult and it's a case-by-case basis which circles back to the question of what do we do with the overbreath issue in this case, right? Sometimes it's not possible to provide complete relief because the injunction goes too far. It even applies to situations where there may not be any plaintiff withstanding at protest. Well, I think that, you know, if you have concerns like that, you can do the same thing that you did in the stay order. But I don't think that it... I think that it is possible to provide complete relief by doing exactly what the district court did, which is don't fire indiscriminately into crowds, don't engage in this behaviour that is going to endanger our plaintiffs and chill our plaintiffs from having to not want to go to these protests or to curb their First Amendment rights in any way. And it's a lot different than... It's a First Amendment type of injury as opposed to what my friend was saying in Lyons. But I'll really let Ms. Long speak to this. Counsel, Judge Gould, I have another question. And it's basically this. Am I correct that a lot of our... the Supreme Court's First Amendment jurisprudence arose out of protest cases? Indeed. And that's one of our main points here, is that these are very fundamental and important rights to our democracy. This is the foundation of our country. And the Civil Rights Act in 1964 was an important piece of legislation. But, you know, John Lewis walking across the Edmund Pettus Bridge in 1965 was a cataclysmic event, because you had the press and you had the protesters and you had these First Amendment rights to express their ideas. And these are peaceful people that we're protecting at these events. And our clients are peaceful. They're not doing anything wrongful. And they have a right to do what everybody else has been doing since the beginning of our nation, which is voice their disagreement with the government and report on it. I know this question is going to take you a little bit over your time, so with the indulgence of my colleagues, let me ask you a practical question. So let's say there's a protest and a crowd of protesters block an entrance or an exit. And they're not posing a threat of imminent harm, which is a part of these provisions. What crowd control measures are available to law enforcement at that point? Sure. They're peaceful in the sense that nobody's posing any immediate threat. That's right. This is Nelson. You're not obeying a lawful... Let's say it doesn't even go to that. First, you have to ask them. You say, you know, please clear the way so that our car can get through. Right. Please disperse. Nobody's dispersing. They've set up a barricade. So then the next move would be to start arresting people. And this is what Gil Kerlikowske says in his reply declaration. But arresting people is what people expect if they break the law. I don't want to belabor the point, but I want to focus on crowd control measures because sometimes officers, depending on the size of the crowd and numerous other factors, don't want to put themselves in a position of engaging directly one-on-one with protesters. So there are crowd control measures that's available to law enforcement, legitimate use of those measures under certain circumstances. What's available if this injunction stands in that circumstance? In that circumstance, the appropriate thing to do would be to arrest somebody. You know, you start arresting people once, and if people are peacefully there, then... But no crowd dispersal tools can be utilized under that circumstance? That is the best crowd dispersal tool that is available to law enforcement. No crowd control weapons can be utilized? I would not use weapons on a crowd that is peaceful. And a crowd that's just merely disobeying a dispersal order is exactly what you had in Nelson. You had somebody who was not obeying a dispersal order. Even if consistent with agency policy? Even if consistent? Well, it's not consistent with agency policy. What agency policy says, and this is in paragraph 5 of the Harvey Declaration at ER 113, is that if you... you're not supposed to use crowd control weapons or chemical irritants unless there's at least active resistance. Passive resistance is disobeying an order to disperse. So this is their own policy. I'm not telling you anything that's drastic or different. And it's in the same things that the state of California and the amici have said. It's in the policies that are cited in the NPPA brief. And it's what Mr. Kurlikowski said in his unrebutted evidence testimony. When you break a law, when you disobey an officer, there's an expectation that you would get arrested. And if you go to the all-white lunch counter and sit there and you're trespassing, then you get arrested for it. And that is a sense of justice that prevents these kind of events from escalating if you start attacking people. Let me see if my colleagues have any additional questions for you before your colleague comes up to the lectern. Thank you. Thank you, Your Honor. Thank you, Your Honors. May it please the Court. Adriana Wong with the ACLU for Plaintiffs. First of all, thank you to the panel for your indulgence and patience with the split of the argument. With that in mind, I would like to expand a bit on my colleagues' comments about CASA and Easy Riders and answer Judge Bennett's question about Vasquez-Perdomo. To start with CASA and Easy Riders, CASA affirmed, didn't unsettle, the established equitable principle that courts have authority to grant complete relief to each plaintiff withstanding to sue. In CASA, the parties actually presented argument about whether a universal injunction was necessary to provide complete relief to the state plaintiffs, and the Supreme Court deferred that question to the lower courts, indicating that there could be a world in which a universal injunction, which is much broader than the injunction at issue here, would be appropriate if necessary to provide complete relief to the plaintiffs. So Easy Riders is still binding circuit authority concerning what is encompassed in the court's authority to grant complete relief. Judge Nguyen, I think, brought up the possibility that it may be impossible for courts to grant complete relief that only benefits the named plaintiffs, and CASA recognizes this. At 606 U.S. at 852, the court states, there may be injuries for which it is all but impossible for courts to craft relief that is complete and benefits only the named plaintiffs. And then it cites to a case where the court affirmed relief that extended beyond the named plaintiffs, indicating that if it's necessary, the court has the authority to grant that sort of relief. Counsel, I have a question for you. If I may, please. So in this appeal of the preliminary injunction, as contrasted with the prior state appeal, am I correct that the injunction should be sustained or should be rejected based on the four-factor test of the Supreme Court in winter, I think it is? That's correct. It's a different standard than the Ken standard. And the the appellants, well, let me ask this. I guess it's the appellees to have the burden of proof on that, correct? I believe so. It's an abuse of discretion standard, and I think this court has recognized repeatedly that the district court has considerable discretion to craft the relief that it feels is appropriate within its authority. We should not reverse the relief unless the relief was an abuse of discretion by the district court. But in getting to what the district court did, did the protesters have their burden of proof on the winter factors? Before the district court, plaintiffs did have the burden on all of the factors. And the district court found that plaintiffs had satisfied their evidentiary burden, that there was an avalanche of evidence that supported their burden as to all of the factors. Thank you. Counsel, let me ask you a question, a hypothetical question about Nome. If, in fact, the interpretation of the alliance that is in Justice Kavanaugh's concurring opinion were the law, that this were the binding determination of the Supreme Court, and obviously it's a concurring opinion, but... I'm having trouble hearing you, sir. I'll try to speak louder, Judge Gould, I'm sorry. Just speak into the mic. Okay. So if Justice Kavanaugh's concurring opinion were the binding law, what would your argument be that you would still win? Absolutely, Your Honor. So we agree with our friend on the other side that there needs to be something more than past injury to establish standing. The concurring opinion in Vasquez-Perdomo recognized that if there is that something more, there could be standing. And here we have something more in two ways. So we both have a realistic likelihood of repeated injury and we have continuing present adverse effects of the past injury, which were not at issue in Vasquez-Perdomo, and which the Supreme Court in Lyons acknowledged was sufficient to establish standing. That's the chilling effect, the ongoing chilling effect on plaintiffs that derives directly from the injuries that defendants inflicted on them. On the realistic likelihood of repeated injury, there are also many distinguishing factors there. We have evidence of official sanctioning and ratification. The District Court made a specific finding of that. In LaDuke and Armstrong, this Court has held that that's sufficient to establish standing, to distinguish Lyons, and also that that's the sort of finding that the Court of Appeals will defer to, unless it was clearly erroneous. And because there is ample evidence in the record. With regard to every protest? Yes, we are. Because this injunction deals with every protest, right? Every protest in the Central District of California concerning the ongoing immigration operations there, the immigration raids there. If I might continue, there are also a number of other distinguishing factors in both Lyons and Vasquez-Perdomo. Plaintiffs' injuries depended on officers, the government's officers, encountering them somewhere in the field, and making an individualized determination of suspicion. That is not at all the case here. Here, as the District Court noted, our plaintiffs are going to the government. They are going to the sites where the government already is, and where they have the sustained pattern of using force. And also, there is no individualized determination of suspicion, much less an arrest or conviction, as there are in the other cases that the government relies on. Because the injury that's being inflicted on them is being inflicted in an indiscriminate and sweeping way. In addition, the government has not disavowed any of this conduct. And this Court stated in LSO v. Stroh, and in other cases, that that weighs strongly in favor of a finding of standing. The District Court, like the Court in Index, walked through the Feergash factors to determine that there was a strong likelihood that the government would continue its conduct. The fact that nobody's been investigated or disciplined for this conduct, the fact that it went on for a number of weeks, and there seemed to be no correction in addition to the evidence of official sanctioning. And I'll just quote briefly from the Lyons decision itself. In Lyons, the Court stated, Lyons would have had standing if he alleged that the city authorized officers to act in the manner that injured him. And here, that's exactly what we are alleging. And the District Court found, we showed, is that the agency that defendants have authorized officers to act in the manner that injured plaintiffs. Counsel, where in the District Court's order is the injunction limited to a particular type of  I don't believe, Your Honor, that there is a description of the subject matter of the protest in the injunction. Because you said a few minutes ago, it's limited to only immigration protests? Yes, Your Honor. I believe that's implicit in the Court's order. That's the sort of thing that I think this Court could consider addressing in the manner that my colleague addressed. But, to be frank, there is no evidence of other ongoing protests. All the evidence of the protests that are responded to by federal officers are the protests of the immigration operation that's ongoing in the District. Does the order provide fair notice to those subject to the injunction that the order only applies to a particular type of protest? I'm not sure about that, Your Honor, but I will say that most protests are policed, are handled by regular police, state and local law enforcement. Really, the protests where DHS agents in particular are responding, where they have a specific pattern and practice that's incorporated into their operations, this crowd control policy, where they have that practice and where they are actively doing protest policing is with respect to these specific protests, at least in the Central District of California right now. I discussed with your co-counsel the question of whether complete relief, whether the complete relief principle as clarified by Trump v. Casa applies to this situation and what to do if we think that it's overbroad. I'm going to read you a quote from the majority opinion in that case. We agree that the complete relief principle has deep roots in equity, but to the extent respondents argue that it justifies the award of relief to non-parties, they are mistaken. I think that's a pretty clear indication of what the Supreme Court thinks about how to apply the complete relief principle. As we've talked about in the last argument and today as well, I think there are serious concerns about the overbreath applying to protests at which the protesters who have standing may not even appear. What do you think we should do with that? Certainly the Supreme Court is dubious about injunctions that extend beyond the parties, but again as I mentioned it allowed for the lower courts to develop and consider the arguments concerning whether even a universal injunction that applied to anyone anywhere could go forward if it was necessary to provide complete relief to the plaintiffs. And again here the injunction is much narrower than that. I'd also submit that Casa is just Well, but the Supreme Court goes on to explain that complete relief is not synonymous with universal relief and a lot of these provisions seem to grant universal relief in its application to any protest within CDCAL applies to any protesters. That sweeps very broadly and I don't know how it can be reconciled with the Supreme Court's guidance. Let me offer one way that I think it can be reconciled with the Supreme Court's guidance. So the Supreme Court said that universal relief or relief that extended beyond the named plaintiffs in Casa, setting aside the state plaintiffs, was not appropriate because prohibiting enforcement of the executive order at issue against the child of the individual plaintiff would give that plaintiff complete relief. Her child would not be denied citizenship. Extending the injunction to cover all other similarly situated individuals would not render her relief more complete. And that I think is the crux of why relief that extended beyond the named plaintiffs in Casa was inappropriate and why the court made its decision based on that. Here, in contrast, there is no way for the government to identify the individual plaintiffs within the crowd of protesters in the same way they could identify the individual plaintiff here to grant her child citizenship. But more importantly, extending the injunction to cover other protesters,  and legal observers would render plaintiffs' relief more complete. And the district court specifically found that extending the injunction to cover other protesters, journalists, and plaintiffs would render their relief more complete and was necessary to render their relief complete. And I think in considering this, we have to take into account that the district court was following this as a tailor, an injunction to the nature. No, I understand your argument, and I think the district court attempted to do that. Our questioning took you over time, but it's a significant case, so we've been very generous with timing today. Let me see if my colleagues have any questions for you before you conclude your arguments. Judge Bennett? Judge Gould? My only question is this. To what extent in considering the injunction under the winter test, can we consider the public's interest in having a society where peaceful protest is not chilled? It's absolutely part of the analysis under the winter's factors. The court balanced the equities and the public interest, the possible harm to the parties, and found that all of them tilted sharply in favor of a preliminary injunction. So when the government says that just because the court can issue an injunction that provides complete relief, it doesn't necessarily mean it has to. It should consider other equitable factors. The district court did that very carefully in the order granting the preliminary injunction, and then revisited the question in its order denying the stay. And we submit that the district court correctly concluded that the public interest in the balance of equities favor the injunction it issued. Thank you. Thank you, Ms. Wall. Let's hear again from the government. Thank you, Your Honors. I want to focus my rebuttal on the scope of relief question. After CASA, the upshot of the Supreme Court's decision is if you think plaintiffs are entitled to some relief on the merits, then at most, they're entitled to complete relief for any plaintiff that can demonstrate standing. This injunction is irreconcilable with that principle in so many different ways. The first is, for example, we heard a lot of discussion on the other side today about how the injunction is appropriate with respect to entirely peaceful protests. But of course, the injunction doesn't contain that proviso. It applies to all interactions between DHS officers at any kind of protest activity. And moreover, this injunction applies even to contexts like those described in this case where the protests were violent. At some protests, officers were attacked with Molotov cocktails, fireworks, and other dangerous projectiles. Protesters tried to break into federal buildings, damage federal vehicles. And at one protest, it looks like somebody shot a gun in the officer's direction. And so even in these circumstances, the restrictions in this injunction would apply. That's far beyond providing complete relief to the other side. Similarly, you don't effectively ban the use of crowd-controlled devices or the use of crowd dispersal orders in every single context. And I was surprised to hear my colleague on the other side say that that was, in fact, what the First Amendment strongly supported, if not repelled. This Court has squarely rejected that proposition in cases such as Puente and Menotti. In the Puente case, this case held that it didn't violate the First Amendment under the retaliation rubric that the other side has articulated for crowd-controlled devices to be used. And so a blanket prohibition on the use of crowd-controlled devices goes far beyond any sort of restriction that would be like that plaintiffs would be entitled to in order to get them any form of complete relief at all. Similarly, in the Menotti case... In response to my question concerning the use of crowd-controlled weapons, part of the response is that that would be inconsistent with policy to use crowd-controlled measures unless there's active resistance. So the other side has a different view of what DHS policies require. DHS policies place strict requirements and restrictions on the use of crowd-controlled devices. And in fact, the District Court said that those policies correctly reflect the restrictions on use of non-lethal force. That was something that the District Court acknowledged. And so those policies, it is consistent with them if protesters are continuing to be disruptive, refusing to leave, and there may only be a few immigration enforcement officers at a scene, it may not be feasible in those circumstances for five or ten officers, I'm not sure how many, to themselves arrest 200, 500, 1,000 protesters, preventing them from leaving. It may not be feasible for them to refrain from using crowd-controlled devices if, for example, at some of these protests, people start erecting barricades in the road, lighting things on fire in order to prevent egress. And so my point here, Your Honor, is only that the injunction sweeps these broad proscriptions and prescriptions into the form of an injunction enforceable by contempt in all of these circumstances, even in circumstances where it wouldn't make sense for those provisions to apply to DHS, and critically, even in circumstances where no named plaintiff withstanding may even be in the crowd. This injunction applies even to protests where not a single plaintiff is there. And so it's certainly, as I've repeatedly emphasized to Your Honor, within the Court's power to redline this injunction, to make it consistent with CASA. And that's what the Court did in the stay posture in part with respect to the injunction's terms for protesters. But I submit that there are just so many flaws with the injunction in light of CASA that it doesn't make sense for the Court to engage in that kind of close editing of the District Court's decision in this posture, particularly where that editing would need to take into account the balancing of the equities. And for that, we think the appropriate remedy is to vacate the injunction, which, Your Honors, on the basis that it is overbroad, and then for the District Court to tailor some additional injunction to the extent that the Court thinks some is appropriate. Any additional questions, Judge Bennett? Judge Gould? All right. Thank you very much, counsel, to all counsel, for your very helpful arguments today on this difficult case. The matter is submitted, and we'll issue a decision as soon as we can.
judges: GOULD, NGUYEN, BENNETT